JAMES S. GRAHAM, TRUSTEE IN BANKRUPTCY OF MAXIM CORPORATION, RESPONDENT, v. EXECUTORS OF CHRISTIAN FLEISSNER, DECEASED, APPELLANTS.

Argued May 23, 1930—Decided February 2, 1931.

For the appellants, *Carl A. Feick.*

For the respondent, *George W. C. McCarter* (*Ralph M. Arkush,* of the New York bar).

The opinion of the court was delivered by

PARKER, J. The original defendant was Christian Fleissner, who died after suit was begun, and his executors were substituted. It is an action at law, based on the claim that Fleissner acquired six thousand three hundred and seventy-five shares of stock of "Maxim Corporation" at a nominal price, and with knowledge, or charged with knowledge, that such stock had been issued at a grossly excessive and fraudulent valuation of certain patents constituting practically all the assets of the company; that the company, a Delaware corporation, went into bankruptcy in New York, and in that bankruptcy proceeding the deficiency was ascertained and apportioned among existing or former stockholders, among whom was Fleissner, who was assessed about $19,000 in the bankruptcy court, and the trustee came over to New Jersey where Fleissner lived, and sued in our Supreme Court to collect that amount. The jury found for the plaintiff and defendants appeal.

The first point made for appellants is as follows:

1. That because of section 2 of *Pamph. L.* 1897, *p.* 124, reprinted in *Comp. Stat., p.* 1656, *pl.* 94 b, either no such action would lie at all with respect to a corporation of another state, or if it would lie, it should be a suit in equity bringing in all parties charged and settling all the rights and liabilities. The statute reads:

"2. No action or proceeding shall be maintained in any court of law of this state against any stockholder, officer or director of any domestic or foreign corporation by or on behalf of any creditor of such corporation to enforce any statutory personal liability of such stockholder, officer or director for or upon any debt, default or obligation of such corporation, whether such statutory personal liability be deemed penal or contractual, if such statutory personal liability be created by or arise from the statutes or laws of any other state or foreign country, and no pending or future action or proceeding to enforce any such statutory personal liability shall be maintained in any court of this state other than in a nature of an equitable accounting for the proportionate bene-

fit of all parties interested, to which such corporation and its legal representatives, if any, and all of its creditors and all of its stockholders shall be necessary parties."

This point is involved in the refusal by the trial court to strike out the complaint; its action in striking out the seventh separate defense; and in overruling objection in point of law to the complaint, reserved in the answer.

The proposition advanced for the appellants is that, notwithstanding an apparently valid bankruptcy proceeding in a federal court, in which stockholders are held to be constructively notified (*McDermott* v. *Woodhouse,* 87 *N. J. Eq.* 615), in which all the equities were considered, and the deficit equitably apportioned among them and ascertained as to Fleissner, when the trustee comes to New Jersey to collect the share of the adjudicated deficit apportioned to Fleissner, he must begin all over again in an equity suit embracing all parties, for the purpose of obtaining an apportionment *de novo.* We do not take this view of the matter: on the contrary, we agree with counsel for respondent that the phrase "statutory personal liability" in the statute means personal liability imposed by statute *extra* the common law liability to make up a deficit of par value, *i. e.,* the so-called "trust fund" theory of capital stock. *Johnson* v. *Tennessee Oil Co.,* 74 *Id.* 32, 37. In fact in *McDermott* v. *Woodhouse, supra,* we expressly held that our courts would not cast up the assets and liabilities of a foreign corporation for the purpose of enforcing this "trust fund" liability as against individual shareholders. We there said this must be done at the domicile of the corporation; but a bankruptcy court may perform the same office. The point made we consider to be without merit.

The seventh separate defense was properly struck out; the complaint properly held; the objection to it in point of law properly overruled.

2. This brings us sufficiently near the facts or questions of fact to justify some statement of them. The figures stated are not necessarily accurate, but accuracy of figures is not important to the decision.

The corporation was organized in 1915 with capital of a

million $10 shares. Thirty-five shares were reserved to qualify directors and the other nine hundred and ninety-nine thousand nine hundred and sixty-five were issued for property purchased, consisting wholly of patents or patent rights, or both, which turned out to be practically worthless and as the jury might find were obviously worthless, in the judgment of anyone considering the matter. There were five or six "promoters" and some changes in the personnel. There were the usual resolutions authorizing purchase at a stated valuation, &c. So the "promoters" received nine hundred and ninety-nine thousand nine hundred and sixty-five shares: they turned in for sale to raise working capital, in all eight hundred and ten thousand shares, leaving for themselves one hundred and eighty-nine thousand nine hundred and sixty-five shares of which they sold to a man named Palmer twelve thousand seven hundred and fifty shares for $5,000, or at about thirty-nine cents a share. It is this transaction which seems to start the chain of notice to Fleissner, particularly as the $5,000 went into the company's treasury. Palmer sold to Fleissner for some price far below par value, a "certificate of participation" in a syndicate which had arranged to get the five hundred and ten thousand shares (or a working majority) for $200,000, or at exactly the rate per share of $5,000 for twelve thousand seven hundred and fifty shares. Palmer was a syndicator. His interest was shown by a certificate which is not a certificate of stock, but of a twelve thousand seven hundred and fifty share interest in the five hundred and ten thousand shares. Palmer endorsed this to Fleissner and one Oppenheimer. We need not follow it farther. Suffice it to say the jury could find Fleissner coming into a distribution of $10 stock at thirty-nine cents, whatever he himself paid. As to other circumstances indicating to him that the patents were fraudulently over-valued, the judge properly charged that "among the circumstances to be considered by you in finding whether Christian Fleissner was under a duty to make further inquiry when he acquired his interest in the syndicate of February 10th, 1916, are the following:

"The difference between the price per share paid by the syndicate and the par value of the stock; the difference between the total par value of the issued stock and the apparent value of the assets of the corporation; whether the stock was purchased by the syndicate in the open market or by direct negotiation with the previous owners; whether a sufficient time had elapsed since the formation of the company to explain the difference between the par value of the stock and the price paid by the syndicate; whether the stock acquired by the syndicate had become a seasoned article of daily merchandise on the stock market; whether the price paid by the syndicate was approximately the market price for the stock.

"If you find that Christian Fleissner became a member of the syndicate of February 10th, 1916, then he was chargeable with notice of all the facts stated in the recitals of the syndicate agreement of that date, although he did not sign the original syndicate agreement."

So much for the general situation with respect to creating liability in the first instance to respond to a deficit in favor of creditors after insolvency. As to this, the argument attacking the refusal to nonsuit and to direct, seems to be beside the mark. The assumption is that Fleissner bought certain certificates of stock. What he bought was a certificate of participation in a syndicate that on its face had a contract for a majority interest of five hundred and ten thousand shares at thirty-nine cents per share of stock recited in the agreement to be selling in open market for $8 per share. The fact that he had later sold what he bought was plainly not a good ground of nonsuit or direction.

3. The next point is that Fleissner parted with all his stock before the bankruptcy. It is in two branches: (1) that even if Fleissner bought into the syndicate at ground floor price with actual or constructive knowledge of over-valuation, he is not liable because not an original subscriber; which is much the same as the point just discussed. (2) That when he sold, even to an innocent purchaser in *market overt* (and we may postulate, at full par value or a premium) his liability *ipso facto* ceased: which would leave *him* with the par value

and the corporation holding the bag. As expressed in the brief:

"A purchaser of stock with notice that it was originally issued for property over-valued does not assume the payment of any assessment that may be later made because of such over-valuation. So long as he remains a member of the corporation he is liable to assessment, but after he has ceased to be a member by transferring his stock in good faith, such liability ceases."

To this we cannot give our assent. We consider the true rule to be that the original subscriber with knowledge, and any transferee from him with knowledge, mediate or immediate, unless some innocent purchaser has intervened, should be chargeable with liability to assessment. Palmer, who sold to Fleissner, was probably liable; so was Fleissner, if he knew or should have known. Fleissner sold in market overt and presumably to an innocent purchaser who escapes. Certainly in such case the liability is not passed on, and, if not, it should remain. *Wolcott* v. *Waldstein,* 86 *N. J. Eq.* 63, 66.

4. The next point is that Fleissner was not a party to the bankruptcy proceeding and was not brought in by due process.

The argument seems to conclude that if he had been a stockholder at the time of the assessment in the bankruptcy proceeding, the notice would have sufficed. There was an order to show cause, of which a copy was mailed to his Newark address. It is not suggested that he did not receive it: the inference is that he did. The real point made is that such notice and jurisdiction, concededly good as to an existing stockholder, is not good as to one who has ceased to be a stockholder. To this there are two answers. (1) The decisions recognize that a stockholder who buys in, with knowledge or charged with knowledge, buys the attaching liability and does not get rid of it *ipso facto* by selling again: as to which see *Selig* v. *Hamilton,* 234 *U. S.* 652 (under a Minnesota statute), and (2) the proceeding in bankruptcy is not a judgment, but an ascertainment of the amount of a claim to be put in judgment, by suit founded on personal service of process; and that for such purpose it was enough to notify Fleissner by mail of the proposed ascertainment.

We follow the rule as enunciated in *Selig* v. *Hamilton, supra,* that where in an administration proceeding in the proper forum, the assets and liabilities have been ascertained and a balance struck, and the deficit in proceeds of the stock apportioned among those considered liable therefor, the adjudication of the amount of such apportionment is conclusive, and notice of the proceeding, of the hearing, and finally of the amount, sent by mail to a former stockholder, particularly if actually received by him, is sufficient to apprise him of the claim and its amount, saving all other personal defenses in an action against him to recover the same.

This, we think, covers the principal points made. The others for the most part are subsidiary and controlled by what has been said. The testimony on over-valuation of assets was not only proper, but vital. The various documents, such as patents and patent applications, were relevant and competent. For the reasons appearing above, there was no error in refusing to nonsuit or direct a verdict; and the criticisms of the charge are not well founded. As to testimony touching the truth of an entry in the corporation minutes bearing on the case, we do not understand that entries in corporate books are more than *prima facie* evidence of statements therein contained. *Turnbull* v. *Payson, 95 U. S.* 418; *Wood* v. *Bank, 9 Cowen* 194, 205; *Signa Iron Co.* v. *Brown, 171 N. Y.* 488, 497. Such evidence is in the nature of things open to contradiction.

The judgment will be affirmed.

*For affirmance*—TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 12.

*For reversal*—None.